Filed 4/7/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br>STEVEN MATTHEW STEWART,<br><br>     Defendant and Appellant. | A157857<br><br>(Napa County Super. Ct. No. 19CR000855) |

Steven Matthew Stewart was placed on probation after pleading no contest to one count of assault by means likely to result in great bodily injury. He contends the trial court abused its discretion in imposing a probation condition requiring him to refrain from using marijuana, a condition appellant sees as unrelated to his offense or future criminality. He further contends his period of probation must be reduced from three years to two years in accordance with a statutory amendment enacted while this appeal was pending. We agree that appellant is entitled to this reduction in the length of his probation period and otherwise affirm the judgment.

**BACKGROUND**

Napa County Police Officer Colton Adams testified at the preliminary hearing that on March 25, 2019, he was dispatched to an unrelated incident

---

     * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I. Discussion, I.A., and I.B.

1

and flagged down by J.R., who told him she had just been assaulted by her ex-boyfriend, identified as appellant. J.R.'s hands were "fidgety," she "wasn't able to stop moving" and she "seemed hysterical" and appeared to have been crying. She said she and appellant had been arguing and appellant threatened to "bash her face in using his head," then as the argument continued, he "headbutted her in the face." Adams did not notice visible injuries, but J.R. reported that she felt pain. Adams did not have an opinion whether J.R. was high on methamphetamine.[1]

A witness told Adams that as appellant and J.R. were arguing, appellant threatened to "beat her down," then attempted to punch her in the face with his left hand, missed the punch, and immediately headbutted her in the face. Another witness saw appellant suddenly headbutt J.R. as appellant and J.R. were arguing.

Appellant told Adams that he and J.R. were currently dating and had a five-year-old daughter together. He denied any physical altercation, saying the argument was all verbal. Appellant told Adams he and J.R. had been arguing for the past few days and, on the day of the incident, J.R. threatened to "put him in jail, because he needed to go to a program." He said he wanted her to go to a program with him. Adams testified that appellant was cooperative and calm.

Appellant was initially charged on March 27, 2019, with one count of felony making criminal threats (Pen. Code, § 422)[2] and one count of misdemeanor battery (domestic violence) (§ 243, subd. (e)(1)), with an

---

[1] As described in the probation report, the police report related appellant having said J.R. was "high on methamphetamine."

[2] Further statutory references are to the Penal Code unless otherwise indicated.

allegation that appellant had a prior conviction for which he served a prison term (§ 667.5, subd. (b).) Following a preliminary hearing, appellant was held to answer, an information was filed stating the same charges, and appellant pled not guilty and denied the special allegations. Subsequently, an amended information added a third count of felony assault by means likely to cause great bodily injury (§ 245, subd. (a)). Pursuant to a negotiated agreement, appellant pled no contest to the third count and the others were dismissed with a *Harvey*[3] waiver. On July 15, 2019, in accordance with the agreement, appellant was placed on probation for three years. The court imposed the terms and conditions recommended by the probation department, with a few modifications not relevant here.

This appeal followed.[4]

## DISCUSSION

### I.

At sentencing, defense counsel objected to imposition of the marijuana condition, arguing there was no indication drugs or alcohol were involved in the offense. On appeal, appellant contends the trial court abused its discretion in imposing this condition because it addresses conduct that is not illegal and is not reasonably related either to the offense or to future criminality. Two questions are presented: whether appellant can maintain this challenge to the probation condition after waiving his right to appeal as

---

[3] *People v. Harvey* (1979) 25 Cal.3d 754.

[4] Appellant filed a notice of appeal on the day he was sentenced, July 15, 2019, but did not request a certificate of probable cause. In December, he filed a motion in this court for permission to request a late certificate of probable cause, which we granted over respondent's opposition. Appellant filed an amended notice of appeal and request for a certificate of probable cause in the trial court on January 2, 2020, and the trial court granted the certificate of probable cause the same day.

3

part of his plea bargain and, if so, whether the condition was properly imposed.

## A.

The plea form appellant signed on June 14, 2019, included a section entitled "Plea Bargain," which stated, "The following promises have been made to me as a condition of my plea(s) . . . ," followed by a handwritten list of terms. Among these handwritten terms was "waive appeal." Appellant initialed this section of the plea form.[5] He argues, however, that this general waiver of appeal was not knowing and intelligent as to the marijuana condition because the plea bargain did not expressly contemplate the court imposing this condition. Respondent disagrees.

"To be enforceable, a defendant's waiver of the right to appeal must be knowing, intelligent, and voluntary." (*People v. Panizzon* (1996) 13 Cal.4th 68, 80 (*Panizzon*).) A " 'general waiver' "—one that "is nonspecific, e.g., 'I waive my appeal rights' or 'I waive my right to appeal any ruling in this case' " (*id*. at p. 85, fn. 11)—"ordinarily includes error occurring before but not after the waiver because the defendant could not knowingly and intelligently waive the right to appeal any unforeseen or unknown future error. (*In re Uriah R.* (1999) 70 Cal.App.4th 1152, 1157.) Thus, a waiver of appeal rights does not apply to ' "possible future error" [that] is outside the defendant's contemplation and knowledge at the time the waiver is made.' ([*Panizzon*]*,* at p. 85; see also *People v. Sherrick* (1993) 19 Cal.App.4th 657, 659; *People v. Vargas* (1993) 13 Cal.App.4th 1653, 1662.)" (*People v. Mumm* (2002) 98 Cal.App.4th 812, 815.)

---

[5] Appellant also initialed a printed section of the form stating, "I understand I have the right to appeal the judgment of the court by filing a notice of appeal . . . ."

*People v. Patton* (2019) 41 Cal.App.5th 934, 940–941 (*Patton*), held that a defendant's waiver of the right to appeal did not bar his challenge to a later-imposed condition of probation that was not referenced in the plea agreement. Respondent distinguishes *Patton* as involving a specific waiver: The defendant agreed to waive his right to appeal "any sentence stipulated *herein*," which *Patton* construed as applying to "the specifics of the stipulated sentence *specified in his plea agreement*" and "*not* encompass[ing] provisions (such as particular conditions of probation) that were to be determined in future proceedings." (*Id.* at pp. 942–943.)

Respondent correctly notes that *Patton* referred to the waiver in that case as "limited" in scope, whereas the waiver in the present case is general. But that distinction begs the question: As stated above, a general waiver of the right to appeal does "not include error occurring after the waiver" that is not "within defendant's contemplation and knowledge at the time the waiver was made."[6] (*People v. Vargas, supra,* 13 Cal.App.4th at pp. 1653, 1662.) Appellant maintains that is the situation here.

---

[6] Appellant expends considerable effort anticipating respondent's reliance on *People v. Espinoza* (2018) 22 Cal.App.5th 794, which held that a certificate of probable cause was required for an appeal challenging a probation condition where the defendant's plea bargain included a waiver of the right to appeal "the judgment and rulings of the court." The court reached this conclusion because it viewed the challenge to a condition of probation as in substance a challenge to the appellate waiver and, therefore, to the validity of the plea. As *Espinoza* summarized its holding, "when a defendant waives the right to appeal as part of a plea agreement, and the waiver's terms encompass the issue the defendant wishes to raise, the defendant must obtain a certificate of probable cause to avoid dismissal of the appeal. With a certificate of probable cause in hand, the defendant may argue that the waiver is not enforceable as to the issue raised, whether because the waiver was not knowing and intelligent or for some other reason.

Respondent argues the marijuana condition was not an unforeseen or unknown error outside the scope of the appeals waiver because the plea agreement clearly contemplated appellant would be placed on probation with conditions, and several references in the agreement indicate the parties contemplated the waiver would apply to future error with respect to "conditions prohibiting the use of certain substances."

The plea form specified that the following promises had been made as part of the plea bargain: "C.T.S. at sentencing, 3 yrs. Formal prob., 52 wks. Bat. Prog., no early term. of prob., search & test clause, all 1203.097 terms, no early termination of probation, waive appeal, no 17(b) @ sentencing, restitution (if any)." The agreement thus specified that appellant would be placed on probation for three years and expressly stated several conditions to be imposed: A batterer's program, a search clause, a substance testing clause, and "all 1203.097 terms." Section 1203.097 requires certain terms of probation for domestic violence offenses. One of these is that the defendant complete a batterer's program (§ 1203.097, subd. (a)(6)), and respondent notes that one of the components the batterer's program must include is a "requirement that the defendant attend group sessions free of chemical influence." (§ 1203.097, subd. (c)(1)(E).) Additionally, respondent maintains appellant's express agreement to a "search & test" clause put him on notice that he would be prohibited from possessing and using certain substances. In

And if the reviewing court determines that the waiver is not enforceable, it will reach the merits of the defendant's underlying claim." (*Id.* at p. 803.)

Appellant takes issue with the *Espinoza* court's view that a challenge to a probation condition imposed after a plea amounts to a challenge to the plea itself. That view is not directly at issue here, as appellant *did* obtain a certificate of probable cause. For this reason, and because respondent does not rely on *Espinoza,* we do not find it necessary to address appellant's argument that the case was wrongly decided.

6

respondent's view, appellant would have understood a standard test clause could include alcohol, illegal drugs and marijuana and, therefore, "[t]hese specified terms were not outside of appellant's contemplation at the time the waiver was made."

We are not convinced. "The right of appeal should not be considered waived or abandoned except where the record clearly establishes it." (*People v. Vargas*, *supra*, 13 Cal.App.4th at p. 1662.) Appellant's plea bargain expressly referred to the section 1203.097 probation terms for domestic violence offenders, but the term respondent relies upon as relevant to substance abuse mandates only that the defendant attend a batterer's program that requires attendance at group sessions free of chemical influence. This term does not imply a general prohibition against all use of "chemical substances," much less all use of marijuana. And while the specification in the agreement that appellant would be subject to search and test conditions may reasonably be construed as implicitly acknowledging he would be prohibited from possessing and using illegal substances, the same is not necessarily true for legally possessed substances such as alcohol and marijuana as allowed under Health and Safety Code section 11362.1.

In *Patton,* the court explained that the fact the defendant knew at the time of his plea that "some unspecified 'reasonable' restrictions or requirements could be imposed as a condition of his probation does not mean he was agreeing to accept *anything* the court decided to include, regardless of how unreasonable he thought it was." (*Patton, supra,* 41 Cal.App.5th at p. 940.) Similarly, although appellant's appellate waiver was broader than the one in *Patton,* we cannot find it was " 'knowing, intelligent, and voluntary' " with respect to a later-imposed condition of probation that was not among the specific terms of probation referenced in the plea bargain.

(*Panizzon, supra,* 13 Cal.4th at pp. 80, 85.)  Accordingly, we conclude appellant's waiver does not prevent him from challenging imposition of the marijuana condition.

**B.**

Appellant argues the trial court abused its discretion in imposing the probation condition prohibiting him from possessing or using marijuana.

" 'The primary goal of probation is to ensure "[t]he safety of the public . . . through the enforcement of court-ordered conditions of probation." (Pen. Code, § 1202.7.)' (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120 (*Carbajal*).)  Accordingly, the Legislature has empowered the court, in making a probation determination, to impose any 'reasonable conditions, as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer. . . .' (Pen. Code, § 1203.1, subd. (j).)" (*People v. Olguin* (2008) 45 Cal.4th 375, 379 (*Olguin*).)

"Generally, '[a] condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ." [Citation.]' ([*People v.*] *Lent* [(1975)] 15 Cal.3d [481,] 486.)  This test is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term. (*Id.* at p. 486, fn. 1; see also *People v. Balestra* (1999) 76 Cal.App.4th 57, 68–69 (*Balestra*).)  As such, even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future

8

criminality. (See *Carbajal, supra,* 10 Cal.4th at 1121.)" (*Olguin, supra,* 45 Cal.4th at pp. 379–380.)

Appellant argues the marijuana condition is invalid because it has no relationship to his offense, relates to conduct that is not in itself criminal, and is not reasonably related to future criminality. The first two points are not at issue: As respondent agrees, it does not appear that appellant was under the influence of any controlled substance at the time of the assault or that marijuana or other drugs were otherwise involved in the offense, and adult possession and use of up to 28.5 grams of marijuana is legal, subject to various conditions. (§ 11362.1.)

The question is whether the condition is reasonably related to future criminality. Appellant argues it is not, as he has no history of use or abuse of marijuana and there is "no indication that marijuana use would trigger alcohol use or affect his mental health." Respondent maintains the condition was reasonably imposed based on appellant's history of using other drugs and the risk of marijuana inhibiting his mental health treatment by interfering with medication appellant was taking for bipolar disorder.

According to the probation officer's presentence report, appellant, 42 years of age, reported that he drank alcohol heavily from ages 22 to 30 and sustained four convictions for driving under the influence (DUI). The probation report lists three such convictions, for offenses in 1994, 1998, and 2006.[7] Appellant reported that he was currently consuming alcohol only once a month and it is "no longer a problem." He reported past use of

---

[7] The report additionally lists, under "DMV Record," five convictions for driving while driving privilege has been suspended or revoked for a DUI conviction. (Veh. Code, § 14601.2, subd. (a).) Several of these are for more recent offense dates—2015, 2016, and 2017—and the report states that appellant's driver's license is "suspended/revoked."

hallucinogens, "mushrooms" once a month from age 16 to 24, and "acid" "every couple of months" from age 20 to 26. He had never engaged in substance abuse treatment. His criminal history includes a conviction for unauthorized possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)) in 2015.

In addition, appellant's history includes convictions for assault with a deadly weapon (§ 245, subd. (a)) in 2004; resisting a peace officer in 2016 (§ 148.1, subd. (a)) and in 1995 (§ 148.10 [resulting in death or serious bodily injury]); and driving in a willful or wanton manner while evading a pursuing peace officer (Veh. Code, § 2800.2, subd. (a)) in 2001 and 2017.

Appellant was diagnosed with bipolar disorder in 2003, for which he takes medication. He has been hospitalized approximately five times and used to attend monthly therapy but had not seen a therapist in two years. The probation officer stated, "Abstention and testing are recommended to encourage a sober lifestyle. If he cannot maintain sobriety on his own while on probation, he should complete an alcohol and drug assessment in his county of residence and engage in the recommended level of treatment. Considering the defendant suffers from bipolar and takes prescription medication, 'street' drugs and/or alcohol may negatively interfere with his medication and can cause a disruption in his mental health regiment [*sic*]. It is recommended the defendant continue with mental health services."

The marijuana condition was one of several addressing potential substance use. Appellant was prohibited from using, consuming, or possessing "any marijuana or illegal drugs or substances, including nonprescribed controlled substances, unless specifically authorized by the court," from possessing drug paraphernalia, and from drinking or possessing alcoholic beverages or being in places where alcohol is sold as the primary

income of the business. He was required to submit to a blood, breath, or urine test if requested by law enforcement or a probation officer, and to submit to search and seizure by a probation officer or law enforcement at any time, with or without a warrant or reasonable suspicion.[8]

The court stated, "With regard to 20 and 21 [the marijuana and alcohol conditions], the defendant's criminal history reflects a drug and alcohol abuse. And then when you combine that with the mental health issues described in the report, I think that very much supports the abstain from marijuana."

Appellant argues any relationship between marijuana use or possession and prevention of future criminality is merely hypothetical, noting that no evidence was offered to support the probation officer's opinion that use of " 'street drugs' " might interfere with appellant's medication for bipolar disorder and arguing that a mental health issue does not have any relationship to potential future criminality. Appellant points to *In re Ricardo P.* (2019) 7 Cal.5th 1113, 1121 (*Ricardo P.*), which confirmed that "*Lent's* third prong requires more than just an abstract or hypothetical relationship between the probation condition and preventing future criminality."

*Ricardo P.* held that while there need not be a " 'nexus between the probation condition and the defendant's underlying offense or prior offenses,' " there must be a "degree of proportionality between the burden imposed by a probation condition and the legitimate interests served by the condition." (*Ricardo P., supra,* 7 Cal.5th at p. 1122.) The electronic device search in that case did not satisfy this requirement because nothing in the record indicated the minor had ever used an electronic device or social media

---

[8] Defense counsel objected to both the marijuana and alcohol conditions, but only the marijuana condition is challenged on this appeal.

11

in connection with criminal conduct, the trial court imposed the condition based on indications the minor had previously used marijuana and a "generalization" that minors typically brag about their drug use on social media, and the "sweeping probation condition requiring Ricardo to submit all of his electronic devices and passwords to search at any time . . . significantly burdens privacy interests." (*Id.* at pp. 1122–1123.)

The marijuana condition does not similarly implicate a fundamental interest, and its relationship to future criminality is supported by considerably more than the generalization relied on in *Ricardo P.* Although there is no evidence appellant was under the influence of drugs or alcohol at the time of the offense, his history includes both alcohol and drug abuse, albeit not specifically marijuana. His comments to Officer Adams that J.R. threatened to "put him in jail, because he needed to go to a program" and that he wanted her to go to a program with him, suggest a contemporaneous issue with substance abuse. Appellant does not challenge the no-alcohol probation condition. Cases have recognized a connection between alcohol and drugs with respect to probation conditions, upholding alcohol prohibitions in cases where the defendant's offense related to drug use because of alcohol's similar effects in impairing judgment and the ability to control behavior. (*People v. Smith* (1983) 145 Cal.App.3d 1032, 1034–1035 [commenting on similarity of effects of alcohol to effects of marijuana and other drugs, including "lessening of internalized self-control"]; *People v. Lindsay* (1992) 10 Cal.App.4th 1642, 1645 [impairment of judgment due to alcohol consumption could reduce drug addict's willpower to refrain from drug use]; *People v. Beal* (1997) 60 Cal.App.4th 84, 87 (*Beal*) [alcohol use related to future criminality where defendant has history of substance abuse]; *People v. Malago* (2017) 8 Cal.App.5th 1301, 1308 [avoiding alcohol would increase defendant's ability

to avoid drug use].)  Despite the legalization of recreational use of marijuana, it remains a controlled substance, classified as a hallucinogen.  (Health & Saf. Code, § 11054, subd. (d)(13).)

Appellant's present offense reflects impaired judgment and loss of self-control, as do some of his past offenses.  It is neither unduly speculative nor unreasonable to view the use of substances that tend to impair judgment and ability to control behavior—whether alcohol or marijuana—as increasing the risk of future commission of offenses of this type.  Nor is it unreasonable to view use of such substances as potentially interfering with the efficacy of appellant's mental health treatment, whether by adverse interaction with the prescribed medication for his bipolar disorder or by undermining his compliance with taking that medication.  According to the probation report, based on a validated actuarial risk assessment tool for domestic violence offenders, appellant was considered to be at "high" risk to commit future domestic violence.[9]  The court did not abuse its discretion in imposing the marijuana condition as one measure to reduce the risk of future offense, in accordance with the probation department's recommendation for "[a]bstention and testing . . . to encourage a sober lifestyle."

Appellant's reliance upon *People v Kiddoo* (1990) 225 Cal.App.3d 922 (*Kiddoo*) (overruled on other grounds by *People v. Welch* (1993) 5 Cal.4th 228, 237) is unavailing.  Appellant likens his case to *Kiddoo*, which invalidated a probation condition prohibiting alcohol (*id.* at p. 927), and distinguishes it from *Beal, supra,* 60 Cal.App.4th at page 85, which upheld such a condition. *Kiddoo* found "no factual indication in the record that the proscribed behavior, in the defendant's case, is reasonably related to future criminal

---

[9] According to the probation report, a score of 7 or higher places an offender in the highest of 7 risk categories; appellant's score was 8.

behavior" because there was no indication alcohol was related to his offense of possession of methamphetamine, despite the facts that the 33-year-old defendant had used marijuana, methamphetamine, amphetamine, cocaine, and alcohol since age 14; said he was a social drinker and used methamphetamine sporadically; and had a prior conviction for possession of marijuana at age 22. (*Kiddoo,* at pp. 927–928.)

The defendant in *Beal*, who pled guilty to methamphetamine possession and possession for sale, characterized herself as a social drinker and did not consider alcohol use a problem but admitted having become involved with methamphetamine at age 26, smoking marijuana and cocaine in her late 20s and experimenting with LSD, was selling methamphetamine to support her drug habit at the time of her arrest, and told the probation officer she "suffered from 'chemical dependency.' " (*Beal, supra,* 60 Cal.App.4th at p. 86.) Rejecting the defendant's reliance upon *Kiddoo,* the *Beal* court stated: "Although an argument can be made that *Kiddoo* is factually distinguishable from this case (see *People v. Lindsay,* [*supra,*] 10 Cal.App.4th [at p.] 1644), we disagree with the fundamental assumptions in *Kiddoo* that alcohol and drug abuse are not reasonably related, and that alcohol use is unrelated to future criminality where the defendant has a history of substance abuse." (*Beal,* at pp. 86–87, fn. omitted.) The same court reaffirmed this view, disagreeing with *Kiddoo,* in *Balestra, supra,* 76 Cal.App.4th at pages 68–69, and *People v. Malago, supra,* 8 Cal.App.5th at page 1308, and we agree. In light of appellant's history of alcohol and drug abuse, mental health issues and commission of a domestic violence offense reflecting inability to control his emotions and conduct, the marijuana condition is reasonably related to future criminality and not disproportionate.

## II.

As earlier indicated, in accordance with his plea agreement, appellant was placed on probation for a period of three years.  At the time, the trial court had discretion to order probation "for a period of time not exceeding the maximum possible term of the sentence" or, where the maximum possible term was five years or less, for a maximum of five years.  (Former § 1203.1, subd. (a).)  While this appeal was pending, the Legislature enacted Assembly Bill No. 1950 (Assembly Bill 1950), amending section 1203.1, subdivision (a), to limit felony probation to a maximum term of two years, absent circumstances not applicable here.  (Stats. 2020, ch. 328, § 2, eff. Jan. 1, 2021.)  The legislation is silent as to retroactivity, but appellant argues it is ameliorative and therefore applies to his case pursuant to the reasoning of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).[10]

## A.

"Generally, statutes are presumed to apply only prospectively.  ([*People v. Superior Court (Lara)* (2018)] 4 Cal.5th [299,] 307.)  However, this presumption is a canon of statutory interpretation rather than a constitutional mandate.  (*Ibid.*)  Accordingly, 'the Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication.'  (*Ibid.*)

---

[10] Appellant first raised this claim in a petition for rehearing after we filed an opinion affirming his conviction, arguing rehearing was required to preserve his constitutional right to effective assistance of counsel and forestall a petition for writ of habeas corpus based on ineffective assistance of counsel.  Assembly Bill 1950 was signed by the Governor on September 30, 2020, the day after appellant's attorney filed the reply brief on this appeal. Counsel did not seek leave of court to file a supplemental brief arguing appellant was entitled to the shortened period of probation.  (Cal. Rules of Court, rule 8.200(a)(4).)  We granted rehearing to permit consideration of this claim.

Courts look to the Legislature's intent in order to determine if a law is meant to apply retroactively. (*Ibid.*)" (*People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*).)

*Estrada* held that "amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." (*Frahs, supra,* 9 Cal.5th at p. 627.) The *Estrada* court reasoned that " '[w]hen the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.' " (*Frahs*, at pp. 627–628.) " '*Estrada* stands for the proposition that, "where the amendatory statute mitigates punishment and there is no saving[s] clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." ' " (*Id.* at p. 628, quoting *People v. Nasalga* (1996) 12 Cal.4th 784, 792.)

Respondent argues *Estrada* does not apply to Assembly Bill 1950 because probation is not punishment. Several recent cases have rejected this view. (*People v. Sims* (2021) 59 Cal.App.5th 943 (*Sims*); *People v. Quinn* (2021) 59 Cal.App.5th 874 (*Quinn*); *People v. Burton* (2020) 58 Cal.App.5th Supp. 1 (*Burton*) [Assem. Bill 1950 limitation on duration of misdemeanor probation].) As explained in those opinions, while probation is viewed as " 'an act of clemency in lieu of punishment' " and primarily "rehabilitative in nature" (*People v. Moran* (2016) 1 Cal.5th 398, 402), probation "can be invasive, time-consuming, and restrictive for a probationer" (*Sims,* at p. 959), who may be subjected to numerous conditions, including restrictions on

16

activities and associations that would otherwise be lawful and requirements such as drug and/or alcohol testing, meetings with probation officers, and submission to warrantless searches and seizures. The probationer " 'is in constructive custody—he is under restraint' [citations]" and " 'there is no question it is a sanction that imposes significant restrictions on the civil liberties of a defendant.' [Citations].)" (*Ibid.*) The California Supreme Court recognized in *People v. Edwards* (1976) 18 Cal.3d 796, 801, that "the traditional view that a grant of probation is a privileged act of grace or clemency has been discredited in favor of the modern view that such a grant should be deemed an alternative form of punishment in those cases when it can be used as a correctional tool." And *People v. Delgado* (2006) 140 Cal.App.4th 1157, 1170, viewed probation as punishment in holding that retroactive application of a law imposing mandatory probation conditions, including a minimum term, increased punishment in violation of ex post facto principles. (See also, *People v. Williams* (1988) 200 Cal.App.3d Supp. 1 [retroactive application of law extending maximum length of probation period unconstitutionally increased punishment].)

By limiting the maximum duration of probation, Assembly Bill 1950 has "a direct and significant ameliorative benefit for at least some probationers who otherwise would be subject to additional months or years of potentially onerous and intrusive probation conditions." (*Sims, supra,* 59 Cal.App.5th 959.) Shortening the length of probation terms is also ameliorative in that it reduces the "potential for the [probationer] to be incarcerated due to a violation." (*Burton, supra,* 58 Cal.App.5th at p. Supp. 15.) Probation violations—which may be based on conduct not amounting to a new crime and need only be proven by a preponderance of the evidence—often result in incarceration. (*Sims,* at p. 960.) The longer the

17

period of probation, the more likely the probationer will be found in violation of a probation condition.  Conversely, by limiting the duration of probation, Assembly Bill 1950 ameliorates possible punishment for probationers as a class by "ensur[ing] that at least some probationers who otherwise would have been imprisoned for probation violations will remain violation free and avoid incarceration." (*Sims,* at p. 960.)

This view of Assembly Bill 1950 is in keeping with the California Supreme Court's application of the *Estrada* principle to legislation that makes reduced punishment possible, as well as that which directly reduces technical punishment.  *Lara*, *supra*, 4 Cal.5th 299, applied *Estrada* in its analysis of Proposition 57, which eliminated prosecutors' discretion to charge juveniles in adult court, instead requiring a transfer hearing for the juvenile court to determine whether the matter should be heard in juvenile or adult court.  Although "Proposition 57 does not reduce the punishment for a crime," *Lara* held *Estrada*'s "rationale" applied because "[t]he possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment." (*Lara,* at p. 303.)  The "possible" reduction of punishment was also the focus in *Frahs, supra,* 9 Cal.5th 618, which found retroactive a statute creating a pretrial diversion program for certain defendants with mental health disorders.  Likening the case to *Lara,* the court stated that the statute "provides a possible ameliorating benefit for a class of persons—namely, certain defendants with mental disorders—by offering an opportunity for diversion and ultimately the dismissal of charges." (*Frahs*, at p. 624; *People v. Francis* (1969) 71 Cal.2d 66 [amendment allowing trial court to exercise sentencing discretion more favorably for individual defendants applied retroactively].)

18

We agree with the *Sims, Quinn*, and *Burton* courts that Assembly Bill 1950 ameliorates punishment within the meaning of *Estrada*. Although the Legislature could have chosen to limit or forbid the retroactive application of the amendment (*People v. Conley,* (2016) 63 Cal.4th 646, 656), it did not do so. Assembly Bill 1950 contains no express requirement that it be applied only prospectively, and, like the *Sims, Quinn,* and *Burton* courts, we see no indication of such intent in the legislative history.

To the contrary, the legislative history demonstrates that the amendment was motivated by concerns that apply to current probationers as much as future ones. As extensively detailed in the *Sims, Quinn,* and *Burton* opinions, the legislative analyses of Assembly Bill 1950 reflect concern with the social and financial costs of the existing probation system—in particular, with probation as "a pipeline for re-entry into the carceral system" due to the large number of people incarcerated for violations of probation, most of which are " 'technical' and minor in nature." (Assem. Floor Analysis, 3d reading of Assem. Bill 1950 (2019-2020 Reg. Sess.) as amended May 21, 2020, p. 1.)[11]

---

[11] According to the bill's author, "California's adult supervised probation population is around 548,000—the largest of any state in the nation, more than twice the size of the state's prison population, almost four times larger than its jail population and about six times larger than its parole population. [¶] A 2018 Justice Center of the Council of State Governments study (<https://csgjusticecenter.org/publications/confined-costly/?state=CA #primary> [as of Apr. 7, 2021]) found that a large portion of people violate probation and end up incarcerated as a result. The study revealed that 20% of prison admissions in California are the result of supervised probation violations, accounting for the estimated $2 billion spent annually by the state to incarcerate people for supervision violations. Eight percent of people incarcerated in a California prison are behind bars for supervised probation violations. Most violations are 'technical' and minor in nature, such as missing a drug rehab appointment or socializing with a friend who has a

The legislative analyses further address the apparent absence of need for longer probation periods with regard to rehabilitation. "Research (https://calbudgetcenter.org/resources/sentencing-in-californiamoving-toward-a-smarter-more-cost-effective-approach/) by the California Budget & Policy Center shows that probation services, such as mental healthcare and addiction treatment, are most effective during the first 18 months of supervision. Research also indicates that providing increased supervision and services earlier reduces an individual's likelihood to recidivate." (Assem. Floor Analysis, 3d reading of Assem. Bill 1950 (2019-2020 Reg. Sess.) as amended June 10, 2020, p. 1.)

It is apparent that the Legislature determined the rehabilitative purpose of probation could best be met, and deleterious effects of the probation system minimized, by shortening the maximum duration of probation. As stated by the *Sims* court, "[w]hile these legislative materials do not speak directly to the issue of retroactivity, they suggest the Legislature viewed Assembly Bill No. 1950 as an ameliorative change to the criminal law that would ensure that many probationers avoid imprisonment. Presumably, the Legislature was aware such ameliorative changes apply retroactively under the *Estrada* presumption. (See *People v. Carrasco* (1981) 118 Cal.App.3d 936, 945 ['A cardinal principle of statutory construction is that

---

criminal record." (Assem. Floor Analysis, 3d reading of Assem. Bill 1950 (2019-2020 Reg. Sess.) as amended May 21, 2020, p. 1.) Additionally, the Prison Policy Institute has found that "like incarceration, probation affects already marginalized populations in troubling ways. Black Americans make up 13% of the U.S. adult population, but 30% of those under community supervision." Additionally, probation fees are an enormous burden on the poor. (Sen. Com. on Public Safety, Rep. on Assem. Bill 1950 (2019-2020 Reg. Sess.) as amended June 10, 2020, p. 4.)

the Legislature is presumed to be aware of existing judicial practices and interpretations when it enacts a statute.'].) There is no indication in the law's text or legislative materials that the Legislature intended to alter the default *Estrada* presumption. This omission suggests the Legislature had no such intent." (*Sims, supra,* 59 Cal.App.5th at pp. 962–963.)

**B.**

This case presents one issue not addressed in *Sims, Quinn,* or *Burton.* While appellant asks us to order that his term of probation be reduced to two years, respondent maintains we cannot do so because the prosecution must be given an opportunity to either agree to this new term or withdraw from the plea agreement pursuant to which probation was imposed. Respondent's argument is based on the rule that a court lacks authority to unilaterally modify a plea bargain after it has been accepted. (*People v. Stamps* (2020) 9 Cal.5th 685, 700–702.)

*Stamps* held that Senate Bill No. 1393 (Senate Bill 1393), amending section 667, subdivision (a), to give trial courts discretion to strike the five-year prior serious felony conviction enhancement, applied to the defendant's case retroactively because the judgment was not yet final. (*Stamps, supra,* 9 Cal.5th at p. 699.) The Supreme Court held the case should be remanded for the trial court to exercise its discretion, but rejected the defendant's argument that the trial court should consider striking the enhancement while otherwise leaving his plea bargain intact. (*Stamps,* at p. 700.) " ' " 'A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound.' [Citations.] Should the court consider the plea bargain to be unacceptable, its remedy is to reject it, not to violate it, directly or indirectly. [Citation.] Once the court has accepted the terms of the negotiated plea, '[it] lacks jurisdiction to alter the

21

terms of a plea bargain so that it becomes more favorable to a defendant unless, of course, the parties agree.' " ' " (*Id.* at p. 701, quoting *People v. Cunningham* (1996) 49 Cal.App.4th 1044, 1047.) Accordingly, *Stamps* held the proper remedy was remand to allow the defendant to seek relief under Senate Bill 1393. If the trial court declined to exercise its discretion to strike the enhancement, the prior sentence would stand. If the court was inclined to exercise its discretion, the prosecution could agree to modify the plea bargain, but if it did not so agree, the prosecutor could withdraw from the agreement. The court could also withdraw its prior approval of the plea agreement. (*Stamps,* at pp. 707–708.)

A different conclusion was reached in *People v. France* (2020) 58 Cal.App.5th 714 (*France*) (review granted Feb. 24, 2021, S266771), which found retroactive Senate Bill No. 136 (Senate Bill 136), amending section 667.5, subdivision (b), to limit its one-year prior prison term enhancement to prior prison terms for sexually violent offenses. (See also *People v. Andahi* (Mar. 19, 2021, C090707) ___ Cal.App.5th ___, 2021 WL 1049820.) Prior to amendment, the statute required courts to impose the enhancement for each prior prison term, although courts could exercise their discretion to strike the enhancement pursuant to section 1385. (*France*, at p. 718.) Since the defendant's prior prison term enhancement was not for a sexually violent offense and his conviction was not final, he was entitled to relief. (*Id.* at pp. 718–721.) But, unlike *Stamps*, *France* found it appropriate to modify the judgment by striking the one-year enhancement despite the sentence having been imposed pursuant to a plea bargain. (*France*, at pp. 727–730.)

For the *France* majority, the critical factor distinguishing *Stamps* was that Senate Bill 1393, at issue in *Stamps*, gave the trial court *discretion* to strike an enhancement while Senate Bill 136 "reduc[ed] sentences directly by

significantly narrowing the scope of an enhancement." (*France, supra,* 58 Cal.App.5th at p. 728.) Under Senate Bill 1393, "it is ultimately a trial court that chooses whether an enhancement is eliminated—meaning that [the change in law] directly implicates the prohibition on a trial court's ability to unilaterally modify an agreed-upon sentence." (*France,* at p. 728.) In Senate Bill 136, by contrast, "the Legislature itself has mandated the striking of affected prison priors by making the enhancement portion of France's sentence illegal." (*France,* at pp. 728–729.)

Additionally, while *Stamps* found that applying Senate Bill 1393 to plea-bargained sentences but otherwise preserving the plea agreement would have been contrary to the purpose of the legislation, *France* concluded the opposite was true for Senate Bill 136. Prior to Senate Bill 1393, trial courts generally had discretion to strike sentence enhancements pursuant to section 1385, but section 667, subdivision (a), prohibited exercising that discretion with respect to serious felony conviction enhancements. Senate Bill 1393 eliminated that prohibition in order to create uniformity in sentencing discretion. *Stamps* explained that because courts do *not* have discretion to strike enhancements that are part of an approved plea bargain, allowing a court to modify a plea bargain involving a serious felony conviction enhancement would undermine the goal of uniformity by elevating these enhancements over others. (*Stamps, supra,* 9 Cal.5th at pp. 702, 704; *France, supra,* 58 Cal.App.5th at p. 729.) *France* concluded that preventing application of Senate Bill 136 to plea-bargained sentences "would thwart or delay the full achievement of the Legislature's intent to reduce the expense and ineffectiveness of enhanced prison sentences based on prior prison terms, especially given that pleas of guilty or no contest 'represent the vast majority

23

of felony and misdemeanor dispositions in criminal cases.' " (*France*, at p. 728, quoting *In re Chavez* (2003) 30 Cal.4th 643, 654, fn. 5.)

Respondent urges us to adopt the reasoning of Justice Pollak's dissent in *France,* which concluded the majority misapplied *Stamps.* Justice Pollak focused on the absence of indication in Senate Bill 136 that the Legislature "intended 'to change well-settled law that a court lacks discretion to modify a plea agreement unless the parties agree to the modification.' " (*France, supra,* 58 Cal.App.5th at p. 734 (dis. opn. of Pollak, J.), quoting *Stamps, supra,* 9 Cal.5th at p. 702.) Rejecting the majority's reliance on the fact that Senate Bill 136 *mandated* striking the defendant's enhancement, Justice Pollak stated that "the reduction of the agreed four-year term to three years without the prosecutor's consent would be no less unilateral than if striking the enhancement had been within the court's discretion. It was not the fact that striking the enhancement in *Stamps* was discretionary that would have rendered automatic reduction of the sentence unilateral and impermissible; that outcome was precluded because the prosecution, which had agreed to a nine-year sentence, had not agreed to any lesser sentence." (*France,* at p. 734.) Justice Pollak's view is consistent with several recent cases addressing Senate Bill 136. (*People v. Hernandez* (2020) 55 Cal.App.5th 942 (*Hernandez*), review granted Jan. 27, 2021, S265739; *People v. Griffin* (2020) 57 Cal.App.5th 1088, review granted Feb. 17, 2021, S266521; *People v. Joaquin* (2020) 58 Cal.App.5th 173, review granted Feb. 24, 2021, S266594.)

As applied to the issues in the present case, we find the analysis of the *France* majority more persuasive. As the majority explained, *Stamps* addressed a situation in which the new law gave the trial court discretion to strike an enhancement but did not require it to do so, thus placing directly in the trial court's hands the decision whether to alter a term of the plea

bargain. *Stamps* therefore had no occasion to consider the effect on a plea bargain of retroactive application of a law through which the Legislature directly affected a plea bargain by rendering one of its terms invalid. Where the ameliorative change in law is mandatory, the question is not whether the Legislature intended to allow the trial court to alter the terms of a plea bargain but whether the Legislature intended to, in effect, do so directly. As stated in *Doe v. Harris* (2013) 57 Cal.4th 64, 70 (*Doe*), "the Legislature, for the public good and in furtherance of public policy, and subject to the limitations imposed by the federal and state Constitutions, has the authority to modify or invalidate the terms of an agreement." "[T]he general rule in California is that the plea agreement will be ' "deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy. . . ." ' (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1070.) That the parties enter into a plea agreement thus does not have the effect of insulating them from changes in the law that the Legislature has intended to apply to them." (*Doe,* at p. 66.)

The *Hernandez* court, and the dissent in *France,* dismissed the significance of the distinction between a change in law permitting the trial court to make a discretionary decision that could alter the terms of a plea bargain and a change in law necessarily altering such terms because *Stamps* focused on indicators of legislative intent to alter the rule prohibiting courts from unilaterally altering approved plea bargains. (*Hernandez, supra,* 55 Cal.App.5th at p. 957; *France, supra,* 58 Cal.App.5th at p. 734 (dis. opn. of Pollak, J.); see *France,* at p. 729, fn. 6.) But because the *Stamps* court was concerned only with legislation permitting the trial court to make a discretionary decision that could alter the terms of a plea bargain, it had no

reason to consider distinctions between such laws and laws that directly invalidate a term of a plea bargain. As the *France* majority noted, the contention that "the operative question is not one of discretion, but merely whether a legislative change gives a court 'authority to modify the plea agreement by leaving the remnants of the agreed-upon sentence intact without securing the parties' assent to the modification.' " "But this contention overlooks *Doe,* which established that plea agreements generally incorporate the Legislature's reserve power to change the law. (*Doe, supra,* 57 Cal.4th at p. 66, 73.) . . . Under *Doe*, it matters very much whether a court makes a discretionary change to a plea bargain (as in *Stamps*) or the Legislature makes a change in the law that necessarily affects the bargain (as here)." (*France,* at p. 729, fn. 6.)

Assembly Bill 1950, like the statute at issue in *France*, "does not involve *Stamps's* repeated and carefully phrased concern with the 'long-standing law that a *court* cannot *unilaterally* modify an agreed-upon term by striking portions of it under section 1385' " but rather "has a direct and conclusive effect on the legality of existing sentences pursuant to *Estrada*." (*France, supra,* 58 Cal.App.5th at p. 729, italics in *France*.)

Moreover, as earlier discussed, *Stamps* was influenced by the fact that allowing the defendant to have his prior serious felony conviction enhancement stricken but keep the rest of his plea agreement intact would be counter to the goal of the legislation at issue in that case. Applying Assembly Bill 1950 to reduce the duration of a plea-bargained grant of probation does not present any such problem. On the contrary, allowing the prosecution to withdraw from plea deals involving probation terms of more than two years would undermine the Legislature's intent to reduce the number of probationers subject to conditions of probation and risk of incarceration for

26

periods the Legislature deemed unnecessary and deleterious. (See, *France, supra,* 58 Cal.App.5th at pp. 729–730 ["construing Senate Bill 136 to allow the People to withdraw from plea deals containing the affected enhancements could prevent the Legislature from fully realizing its goals of departing from mass incarceration, saving money on prison costs, and keeping families together"]; *Harris v. Superior Court* (2016) 1 Cal.5th 984, 992 [allowing prosecution to withdraw from plea agreement and reinstate original charges if defendant successfully petitioned for resentencing under Proposition 47 would undermine proposition's purpose of reducing number of nonviolent offenders in prison].)

Finally, we agree with the *France* majority's conclusion that *Stamps* should not be read as holding retroactive ameliorative legislation may be applied to plea bargained sentences only if legislative intent for it to do so is *express.* Disagreeing with *Hernandez,*[12] *France* explained, "*Stamps* did not hold that such express provisions are necessary for a retroactive legislative amendment to authorize a trial court to strike an agreed-upon enhancement while holding the parties to the remaining terms of the plea agreement," only that "the absence of such provisions 'undercuts' the notion that the Legislature intended to affect the otherwise applicable and long-standing bar on a trial court's ability to unilaterally modify plea-bargained sentences. (*Stamps, supra*, 9 Cal.5th at p. 704.) As *Stamps* made clear by also analyzing Senate Bill 1393's purpose, the question of how a statute applies to plea-bargained sentences comes down to legislative intent. (See *Stamps,* at

---

[12] *Hernandez* stated that the silence of Senate Bill 136 regarding pleas "refutes any suggestion the Legislation intended to create special rules for the court to unilaterally modify the plea agreement once the enhancements are stricken." (*Hernandez, supra,* 55 Cal.App.5th at p. 958.)

pp. 701–702.)" (*France, supra,* 58 Cal.App.5th at pp. 727–728.)  Furthermore, requiring an express reference to plea bargaining in a statute or its legislative history "would mean that any retroactive ameliorative change in a criminal law that does not contain such an express reference would entitle the prosecution to reopen the plea bargain to add back previously dismissed charges or allegations.  But as discussed above, the *Estrada* presumption of retroactivity arises only when an ameliorative amendment lacks an express retroactivity provision.  (*Estrada*, *supra*, 63 Cal.2d at pp. 744–745.)  In essence, then, [requiring an express reference to plea bargains] would create a rule that defendants who plead guilty may benefit from the retroactive operation of any law whose retroactivity depends on the *Estrada* presumption only if the prosecution assents.  Such an approach would drastically undermine the *Estrada* principle that the Legislature intends a lighter penalty to apply 'to every case to which it constitutionally could apply' (*Estrada*, at p. 745), particularly as defendants who plead guilty represent the vast majority of convictions (*In re Chavez* [(2003)] 30 Cal.4th [643,] 654, fn. 5).  We see no indication in *Stamps* that the Supreme Court intended such a result." (*France, supra,* 58 Cal.App.5th at p. 730.)

## DISPOSITION

The probation order is modified by specifying that appellant is granted formal probation for a period of two (2) years.  In all other respects, the judgment is affirmed.

28

_____
Kline, P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*People v. Stewart* (A157857)

Trial Court:                    Napa County Superior Court

Trial Judge:                    Hon. Mark S. Boessenecker


Attorney for Appellant:         By Appointment of the Court of Appeal
                                First District Appellate Project
                                Kaiya R. Pirolo

Attorneys for Respondent:       Attorney General of California
                                Xavier Becerra

                                Lance E. Winters
                                Chief Assistant Attorney General

                                Jeffrey M. Laurence
                                Senior Assistant Attorney General

                                Rene A. Chacon
                                Supervising Deputy Attorney General

                                Julia Y. Je
                                Deputy Attorney General